UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

JERMAINE LAMB,

                Petitioner,

           -against-

SUPERINTENDENT MICHAEL CAPRA,

                Respondent.

------------------------------------x

**MEMORANDUM & ORDER**
20-CV-599 (EK)

ERIC KOMITEE, United States District Judge:

## I.   Introduction

      Petitioner Jermaine Lamb seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Lamb was convicted of nine crimes, including Attempted Murder, in connection with the 2011 shooting of a pregnant woman named Jermoine Brayboy in Queens County.  The trial judge sentenced Lamb as a "second violent felony offender" to a prison term of twenty-eight-and-a-half to thirty-two years.  He is currently incarcerated at the Attica Correctional Facility in Wyoming County, New York.

      Proceeding *pro se*, Lamb raises eight arguments in his petition: first, that police violated the Fourth Amendment by accessing his cell phone location data without a warrant; second, the State impermissibly obtained (and used as evidence) recordings of certain phone calls he made while in custody at Rikers Island; third, the trial court's remarks during jury

selection violated his due process rights; fourth, the trial court erroneously admitted evidence regarding the circumstances surrounding his arrest, depriving him of due process and a fair trial; fifth, his trial counsel rendered ineffective assistance; sixth, the State presented evidence of uncharged crimes without proper notice to defense counsel; seventh, the State committed a *Brady* violation by failing to provide him with certain discovery, either at all or in a timely manner; and eighth, his sentence is unlawful because it resulted from an inconsistent verdict.

## II.  Background

Officers of the New York City Police Department arrested Lamb in Brooklyn on the morning of June 15, 2011. Arce[1], 389:14-24, 394:4-13.[2]  He was charged pursuant to Queens County Indictment Number 1591/2011.  H1 at 1, ECF No. 8 at 1.[3]

Prior to trial, Lamb moved to suppress certain "short-term historical cell-site location data" that the prosecution had obtained from T-Mobile.  New York City police

---

[1] Citations to a name indicate testimony given by that witness during the trial before Justice Margulis on August 13, 14, 19-22, and 26-28, 2013. "Tr." denotes non-testimonial portions of the trial record.

[2] All pagination cited in this Order reflects the transcript of the identified part of the record rather than the "ECF" pages of the files submitted on the docket.

[3] "H1" refers to the transcript of the suppression hearing held before Justice Zayas on April 4, 2012.  "H2," ECF No. 8 at 143, refers to the follow-up pretrial hearing held before Justice Zayas on August 15, 2012.

officers used this data to track (and arrest) Lamb.  H1 at 2-3.
Justice Joseph Zayas conducted a suppression hearing, *see id.*,
and ruled that the location data was properly obtained without a
warrant pursuant to 18 U.S.C. § 3125(a) because an emergency
situation existed at the time.  H2 at 10.  The case then
proceeded to jury selection and trial before Justice Ira
Margulis in August 2013.  Tr. at 1.

**C.   Trial**

   1.   State's Case-in-Chief[4]

        The State called thirteen witnesses.  The shooting
victim, Jermoine Brayboy, and her partner Sean Lee both
testified.  Lee had known Lamb for years through mutual friends
because they were from the same neighborhood.  Lee 570:14-25.

        Brayboy testified that in June of 2011, she and Lee
were living together on 145th Street in Queens with their four
children, and she was nine months pregnant with their fifth
child.  Brayboy at 353:16-17, 355:1-10.  Approximately a week
before the shooting, Lamb had left Danielle Forrester, who was
also pregnant, and her two children at Lee and Brayboy's home.
Lee at 569:21-25.  Lamb was the father of one of Forrester's
children and of her unborn child.  *Id.* at 570:3-8.  Brayboy
testified that on the afternoon of June 15, Forrester

_____

   [4] The facts that follow are drawn from the state court trial transcript.

accompanied her to her prenatal appointment, leaving Lee at home with their oldest daughter and Forrester's two children. Brayboy at 356:24-357:15.

While Brayboy and Forrester were out, Lamb arrived at the 145th Street residence, driving a black Toyota Avalon. Lee at 572:17-573:21. Lamb was looking for Forrester and waited for her return. *Id.* at 574:11-575:4. Brayboy testified that when she and Forrester returned home at 4:30 p.m., Lamb asked to speak with Forrester in the basement and the pair went to the basement together. Brayboy at 358:4-12. Lee testified that while they were in the basement, he heard "two minutes of screaming back and forth" followed by silence. Lee at 575:16-22. Lee then saw Forrester come out of the basement covered in blood. He testified that Forrester said her teeth had been "rearranged." *Id.* at 575:25-576:8. Lee saw that Lamb's car was gone, although he had not seen him leave, and called an ambulance for Forrester. *Id.* at 576:10-18. Police officers arrived along with the ambulance. *Id.* at 576:19-20.

One of those officers, Angel Rolon, also testified. Officer Rolon and his partner, Lane Broncado, arrived at around 4:50 p.m. Rolon at 375:10-376:12. Rolon testified that although hysterical, Forrester informed the officers that "she had a dispute with her child's father" and "was struck and knocked unconscious." *Id.* at 377:8-19. Forrester was

4

transported to a nearby hospital for treatment.  *Id.* at 377:22-378:5.

Lee testified that while the officers accompanied Forrester to the hospital, he received a call from Lamb, who asked to speak with Forrester.  Lee at 578:4-15.  After Lee informed Lamb that he had called the police and that Forrester was in the hospital, Lamb called back several more times that night.  *Id.* at 578:11-22.  Lee testified that Lamb threatened to "button up my shirt," which Lee understood to mean that he would "shoot me up in my chest."  *Id.* at 578:17-22.  Lee testified that, on another phone call between 8:00 and 9:00 p.m., Lamb told him that he was "going to show [Lee] how we young boys ride."  *Id.* at 579:2-8.  Later, at about 10:00 p.m., Lee heard the sound of gunshots "start to fire through the window."  *Id.* at 579:19-580:6.  He shouted for Brayboy to get down, but by the time she did she had already been shot in the leg.  *Id.* at 580:8.  Meanwhile, the couple's children hid in the kitchen and behind a couch.  *Id.* at 579:2-14, 580:20-22.

Lee testified that as the shooting was ongoing, he moved to the front door to brace it in case anyone attempted to enter.  *Id.* at 582:13-19.  As he did so, he told the jury, he was able to see who was doing the shooting: Lamb was leaning out of the window of his black Toyota Avalon, shooting at the house.  *Id.* at 581:11-582:4.  When the shooting stopped, Lee called 911.

5

*Id.* at 583:22-23.  The police and an ambulance soon arrived, and
Brayboy was taken to the hospital to have the bullet removed
from her left leg.  Brayboy at 363:13-18.

One of the officers called to the scene was Detective
Robert Reed.  Reed at 452:7-453:10.  Reed testified that
although Brayboy had already been moved to the hospital, he
spoke with Lee, from whom he learned that Lamb had fired on the
house.  *Id.* at 455:1-5.  Detective Reed also testified that Lee
provided him with a cell phone number and a description of Lamb
and his black Toyota Avalon.  *Id.* at 455:23-25, 456:1-6.

The police then contacted T-Mobile to obtain location
data for the cell phone associated with Lamb's phone number.
*Id.* at 457:10-20.  T-Mobile sent "electronic information as to
latitude/longitude, GPS-type coordinates within a range of where
the phone could be located."  *Id.* at 457:18-20.  Detective Reed
testified that with the help of this data, he found the black
Avalon at around 4:00 a.m. on 57th Street near Linden Boulevard.
*Id.* at 459:17-22.  Through the car window, Reed saw several
spent shell casings.  *Id.* at 459:1.  He remained nearby to
conduct surveillance, on the theory that Lamb might return to
the car or be nearby.  *Id.* at 459:24-460:5.  Detective Reed also
called Lee, who told him that he was familiar with that area,
that he had been to a specific house on the block with Lamb

before, and that Lamb was friendly with the resident of that
house's basement.  *Id.* at 460:19-24.

Detective Reed testified that around 6:00 a.m., an
individual he later identified as the homeowner, John Hill,
exited the house.  *Id.* at 463:20-464:5.  They spoke.  Hill
informed the detective that he knew the driver of the black
Toyota Avalon as someone who occasionally visited his basement
tenant, Harold Reed, and confirmed that a picture of Lamb showed
that visitor.  *Id.* at 464:1-8.  The detectives evacuated Hill
and his family from the home and called for more police vehicles
and personnel.  *Id.* at 464:17-22.  At around 9:30 a.m., Harold
Reed emerged from the basement, and Detective Reed learned that
Lamb was in the basement with "a girlfriend of his by the name
of Jateria Wright."  *Id.* at 465:24-25, 466:11-19.  Hours later —
shortly after noon that day — Lamb and Wright exited the
basement, and Lamb was arrested.  *Id.* at 467:6-7, 468:2-3.

Lamb was held at Rikers Island following his arrest.
Tarsha Brown, an investigator with the New York City Department
of Corrections, testified that Lamb made a series of phone calls
from Rikers following his arrest.  Brown at 636:9-638:23,
641:18-642:5.  On these calls, Lamb — using what the prosecution
contended was coded language referring to a gun and bullets —

asked Wright to get his "daughter" from Hill's basement along with "the Gerber bottles" and bury them in the ground.  Tr. 845.[5]

      2.   <u>Defense Case</u>

      The defense called two witnesses, Danielle Forrester and her son, Devante Lewis.  Contradicting her statement to the police on the day of the shooting, Forrester testified that she had accidentally fallen and hit her mouth while talking to Lamb and that he did nothing to harm her.  Forrester at 667:10-22.  She claimed that Detective Reed had told her that if she did not blame Lamb, she would lose her children to protective services.  Forrester at 669:9-12.  Lewis, who was in Lee's house when Brayboy was shot, testified that Lee had not gone to the door during the shooting, as he'd claimed — and therefore that Lee would not have been able to identify Lamb as the shooter.  Lewis at 767:2-11.

**D.  Verdict and Sentence**

      At the conclusion of trial, Lamb was convicted of Attempted Murder in the Second Degree, Reckless Endangerment in the First Degree, Attempted Assault in the First Degree, Assault

---

[5] Testimony at trial indicated that all calls out of Rikers are recorded, apart from calls to "attorneys, clergymen or physicians with prior authorization by DOC."  Brown at 634:1-5.  Brown testified that inmates are notified in a variety of ways that calls will be recorded: in the inmate handbook, in signs posted next to the phones, and by a recorded message that plays automatically through the phone before a call can be placed.  *Id.* at 634:9-21.  Brown also explained that the Department of Corrections keeps those phone calls in the regular course of business in a searchable database. *Id.* 635:4-20.

in the Second Degree, Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree, Assault in the Third Degree, Criminal Possession of a Forged Instrument in the Second Degree, and Criminal Contempt in the First Degree.  Tr. 900:24-901:11.  On September 19, 2013, Lamb was sentenced as second violent felony offender to an aggregate prison term of from 28.5 to 32 years, to be followed by five years of post-release supervision.  Sentencing Tr., at 1-7, ECF No. 8-4; ECF No. 8-5.  Lamb is currently serving that sentence.

**E.   Appeals and Collateral Proceedings**

Shortly before sentencing, Lamb's counsel filed a motion to set aside the guilty verdicts pursuant to Article 330.30 of New York's Criminal Procedure Law.  ECF No. 8-6, at 1. The trial court denied that motion.  Weeks later, Lamb — proceeding *pro se* — asked the trial judge to vacate the judgment and sentence pursuant to C.P.L.R. §§ 440.10 and 440.20.  *Id.* at 6.  The trial court also denied that motion.  *Id.* at 25-26. Lamb then filed a supplemental motion seeking the same relief on the same grounds, which the trial court again denied.  *Id.* at 43.

Following a series of denials of motions for leave to appeal to the Appellate Division, Lamb perfected his appeal on June 30, 2017.  ECF No. 8-7, at 30.  His counseled appellate

brief raised four claims, all of which Lamb has raised again in his habeas petition: (i) that using "using [Lamb's] phone as a tracking device" without a warrant violated his Fourth Amendment rights; (ii) that the admission of Lamb's calls Lamb from Rikers Island violated his Fourth Amendment rights; (iii) that the trial court deprived Lamb of due process by virtue of statements it made during jury selection before the venire; and (iv) that the trial court deprived Lamb of due process and a fair trial by permitting certain witness testimony.  *See* Second Dep't Brief at 26, 35, 40, 49, ECF No. 8-7.

The Second Department also granted Lamb leave to file a supplemental, *pro se* brief.  In that brief, he raised three additional claims, each of which he has also raised in his habeas petition: (v) that his trial counsel was constitutionally ineffective because (a) he "didn't enhance" a tape recording of Lamb's Rikers phone call or "call for a translator" of the phone call, (b) he "failed to secure independent medical testimony of the victim's injury," (c) he "failed to object on several meritorious [evidentiary] issues," and (d) he "neglected to move for dismissal of indictment or dismissal of Attempted Murder . . . on the grounds of insufficient evidence"; (vi) that the "prosecutor illegally submitted evidence [of a] prior uncharged crime" without "holding a *Ventimiglia* Hearing"; (vii) and that the prosecutor violated Lamb's rights under *Brady v. Maryland* by

10

"failing to provide [him] with a 911 Sprint material associated with the alleged crime," as well as failing to turn over "the discovery sheet" until "the middle of trial."  *See* Lamb's *Pro Se* Second Dep't Brief at 7-9, ECF Nos. 8-7, 8-8.

The Second Department considered Lamb's counseled brief and all three claims in his "pro se supplement brief," and affirmed Lamb's conviction and sentence in their entirety. *People v. Lamb*, 164 A.D.3d 1470 (2d Dep't 2018).

Lamb then sought leave to appeal to the Court of Appeals, which that court denied on February 25, 2019.  *People v. Lamb*, 32 N.Y.3d 1206 (2019).  Lamb's conviction therefore became final on April 28, 2019 — when his time to seek a writ of certiorari at the United States Supreme Court expired.  *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).

Lamb filed this petition on January 29, 2020 — within the one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2244(d)(1).  This Court accepted Lamb's amended petition on March 31, 2022.

### III. Legal Standard

28 U.S.C. § 2254, as amended by AEDPA, governs an application for a writ of habeas corpus for a person in custody pursuant to the judgment of a state court.  Under AEDPA, a petitioner challenging a determination that was "adjudicated on

the merits" in state court must demonstrate that the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).  The state court's findings of fact are "presumed to be correct," and the petitioner can rebut this presumption only "by clear and convincing evidence." *Id.* § 2254(e)(1).

A legal conclusion is "contrary to" clearly established federal law if it "contradicts the governing law set forth in" the Supreme Court's cases or "confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, yet "arrives at a result different from [that] precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003).  And a decision involves an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle" in the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). It is the petitioner's burden to show that the state court applied the governing principle in an objectively unreasonable manner. *Price*, 538 U.S. at 641.

It is not enough that the federal court conclude, in its independent judgment, that the state court's decision was incorrect or erroneous:  "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## IV.  Discussion

### A.  Fourth Amendment Claims

Lamb's first two claims implicate the Fourth Amendment's prohibition on unreasonable searches.  In his "Ground One," he contends that police officers used his "phone as a tracking device without first obtaining a warrant." Amended Petition ("Pet.") at 5, ECF No. 15.  In Ground Two, he contends that his phone calls at Rikers Island were recorded without his knowledge.  *Id.*

Fourth Amendment claims may not be raised on habeas review, so long as the State provided the petitioner with "an opportunity for full and fair litigation" of the claims.  *Stone v. Powell*, 428 U.S. 465, 482 (1976); *see also Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983).  The Second Circuit has held that "New York state courts provide facially adequate procedures to redress Fourth Amendment violations."  *Ethridge v.*

*Bell*, 49 F.4th 674, 686 (2d Cir. 2022).  Thus, to show that he was denied an adequate opportunity to litigate these claims, Lamb must establish an "unconscionable breakdown" in the process, which requires showing that the state courts "failed to conduct a reasoned method of inquiry into relevant questions of fact and law."  *Capellan v. Riley*, 975 F.2d 67, 71 (2d Cir. 1992).

    1.   <u>Location Data From Lamb's Cell Phone</u>

Lamb's first argument is that law enforcement illegally obtained his location information from T-Mobile without a warrant.  The N.Y.P.D. obtained this information by requesting it from T-Mobile pursuant to 18 U.S.C. § 3125(a).  H2 at 10:21-11:8.[6]  That provision is unchanged, as relevant here, since the action that Lamb challenges.  It authorizes "any [designated] investigative or law enforcement officer" to "have installed and use a pen register or trap and trace device" without court approval, so long as two criteria are satisfied. 18 U.S.C. § 3125(a).  The first criterion is that the officer "reasonably determines" that "an emergency situation exists," involving an "immediate danger of death or serious bodily injury

---

[6] The N.Y.P.D. first attempted to "get surveillance or a pen register on [Lamb's] phone," but they "were unable to obtain one at that exact moment." H1 at 14:1-15.  Officers therefore "conferred with T-Mobile," and "with their assistance an exigent circumstances form was prepared," and "at some point after that T-Mobile began to relay latitude and longitude coordinates for that phone to us."  *Id.*

to any person." *Id.*  The second is that law enforcement obtain "an order approving the installation or use" of the tracking device within forty-eight hours of installation.  *Id.*

Lamb's counsel moved to suppress the location data and the fruits thereof before trial.  Defendant's Motion to Suppress, ECF No. 16, at 6; H2 at 10:12-20.  Justice Zayas held a suppression hearing on April 4, 2012, *see generally* H1, and subsequently "received [Lamb's counsel's] memo" and the government's reply on the issue.  June 15, 2012 Conference Tr. at 2:8-9, ECF No. 8.  At an August 15 hearing, Justice Zayas discussed Lamb's suppression motion at length on the record; he concluded that there were exigent circumstances sufficient to satisfy the requirements of 18 U.S.C. § 3125.  H2 at 10:21-11:8.  On appeal, Lamb raised the same issue, and the Appellate Division affirmed, agreeing that the State had "established that the police were justified in proceeding without a warrant due to the existence of exigent circumstances."  *Lamb*, 164 A.D.3d at 1471.

Lamb has alleged no facts that would suggest an "unconscionable breakdown" in the state court's process. *Capellan*, 975 F.2d at 71.  Given the process did occur, as discussed above, this claim cannot succeed.  *Stone*, 428 U.S. at 469.

     2.   <u>Recording of Lamb's Calls at Rikers</u>

Lamb's second Fourth Amendment argument is that the admission of his Rikers calls violated his right to be free from unreasonable searches and his due process rights.  He asserts that he was "never informed" that the recordings could "be turned over to the Prosecution" — only that his calls were "recorded for security purposes."  Pet. at 5.  Lamb's Fourth Amendment objection is barred (again) by the rule of *Stone v. Powell*.  And both arguments — Fourth Amendment and due process — are barred because the state appellate court denied them on an independent and adequate state-law ground: that Lamb did not preserve them for appellate review.

Lamb raised this issue, too, before the Appellate Division.  *See Lamb*, 164 A.D.3d at 1471.  The Appellate Division rejected it, relying on New York's contemporaneous objection rule.  *Id.*  Under that rule, in order to preserve a question of law for appeal, "a protest thereto" must be made "by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."  N.Y. Crim. Proc. Law § 470.05(2).  The Appellate Division held that Lamb failed to preserve this Fourth Amendment objection for appellate review, and that "[i]n any event, the [trial] court properly admitted

the recordings and transcripts of the telephone calls." *Lamb*, 164 A.D.3d at 1471.[7]

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The contemporaneous-objection rule is a "firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 102-104 (2d Cir. 2011).  Thus, Lamb's failure to comply with it constitutes an independent and adequate state ground for the state court's rejection of this Fourth Amendment claim.

And Lamb has not alleged — let alone demonstrated — either cause and prejudice, or that any failure to consider the claim "will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  Accordingly, claim is denied.

---

[7] "[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state court, even where the state court has also ruled in the alternative on the merits of the federal claim." *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005).

**B.    Trial Judge's Remarks During Jury Selection**

Lamb next argues that the trial court violated his due process rights (and a state procedural rule[8]) by making two statements at jury selection.  First, Lamb claims that the trial judge made false statements to prospective jurors during selection.  Pet. at 5.  According to Lamb, these statements suggested to jurors that if they were excused for lack of language proficiency they would not be paid for their services and could be required to take English classes.  *Id.* at 5; *see* Tr. 4:6-11.  Second, he refers to comments "suggesting" that "it was unimportant whether jurors understood [the court's] legal instructions."  Pet. at 5.  This refers to a comment Justice Zayas made to a potential juror who claimed not to be "able to answer if you ask any questions."  Tr. 179:13-14.  Following a series of questions and answers from the juror, Justice Zayas commented that "[s]o far you've answered all my questions without any problems," and "I guarantee you that most of the people here don't understand the intricacies of the criminal

---

[8] Lamb says that the trial judge violated Section 270.15 of the state's Criminal Procedure Law.  But the Supreme Court held long ago that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  This rule was enshrined in AEDPA.  *See* 28 U.S.C. § 2254(a) (providing relief to people in state custody "in violation of the Constitution or laws or treaties of the United States").

process or the laws that I explain, the rights that the defendant has." *Id.* at 180:22-25.

Again, however, Lamb failed to preserve these arguments.  The Appellate Division expressed its "strong disapproval" of the trial court's remark concerning English language proficiency, but nonetheless held that Lamb "failed to preserve [his objection] for appellate review" because he did not contemporaneously object.  *Lamb*, 164 A.D.3d at 1471-72.  This court is therefore barred from reviewing Lamb's argument absent a showing that cause existed for Lamb's procedural default, that he suffered actual prejudice, or that a miscarriage of justice would result from this court's denial of the claim.  But Lamb has made no arguments to that effect, and again, nothing in the record suggests that such exceptions apply.

## C.   Admission of Evidence Regarding Arrest

Lamb argues that his rights to a fair trial and due process were violated when the trial court allowed witnesses to testify "extensively and in detail about the circumstances of [his] arrest."  Pet. at 5-6.  In particular, he suggests that the witnesses sensationalized the events in question by referring to "a 'Hostage Situation' that never existed and detailing tactical measures taken by the Police."  *Id.* at 6.

Once again, Lamb's argument is procedurally barred, because it was not preserved for appellate review. Lamb raised this contention before the Appellate Division; that court held that he "failed to preserve for appellate review his contention that the Supreme Court erred in admitting testimony at trial regarding the manner of his arrest." *Lamb*, 164 A.D.3d at 1472. The court further held that the trial court had "providently exercised its discretion in admitting that testimony." *Id.*

And again, Lamb has not proffered facts that would suggest cause for the failure, actual prejudice, or that a miscarriage of justice would result from this court denying review of the claim. This claim, too, must therefore be dismissed.

## D.   Ineffective Assistance of Counsel

Lamb raises four arguments in support of his ineffective assistance claim. First, he contends that Glenda Callender, the lawyer who represented him at the pretrial suppression hearings, was ineffective in her challenge to the cell-site location data. Second, he contends that his trial counsel — Ernest Dubois[9] — was ineffective in dealing with an audio recording of a call between Sean Lee and Danielle Forrester. (Lamb contends Lee admitted, on that call, to not

___

[9] "Dubois" is alternatively spelled "Dubose" by Lamb in his petition. The court adopts the spelling "Dubois" because it is the spelling used in the trial transcript.

having seen the shooter on the night of the crime.)  Third, he
contends that Dubois was ineffective for failing to move to
dismiss the indictment for "repugnancy" of the attempted murder
and reckless endangerment charges.  And fourth, he contends that
Dubois was ineffective for failing to properly move to dismiss
the attempted murder charge at trial on the ground of
insufficient evidence.  These arguments were rejected on the
merits in state court.  *Lamb*, 164 A.D.3d. at 1472.

On habeas claims alleging ineffective assistance,
"AEDPA review is doubly deferential": the underlying *Strickland*
standard "strongly" presumes that counsel "rendered adequate
assistance and made all significant decisions in the exercise of
reasonable professional judgment," *Woods v. Etherton*, 578 U.S.
113, 117 (2016), and AEDPA layers on the requirement that the
state court's decision can be disturbed only if it was "contrary
to, or involved an unreasonable application of, clearly
established Federal law."  28 U.S.C. § 2254(d)(1).  In these
circumstances, federal courts must give "both the state court
and the defense attorney the benefit of the doubt." *Burt v.
Titlow*, 571 U.S. 12, 15 (2013).

Under *Strickland v. Washington*, a criminal defendant
must first overcome the "strong presumption" that counsel's
performance fell "within the wide range of reasonable
professional competent assistance."  466 U.S. 668, 688 (1984).

This is an "objective standard of reasonableness." *Id.* Even if the defendant makes this showing, he does not yet qualify for relief. He must also establish prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

1. Pretrial Counsel's Challenge to Location Data

Lamb first argues that his pretrial counsel, Glenda Callendar, failed to render an effective objection to the N.Y.P.D.'s collection of real-time cell-site location data. Pet. at 9-17. Specifically, he argues the Callendar "failed to conduct any legal research" at all and did not "properly state the law of exigency," the requirements of which he argues were not met. *Id.* at 10, 16. Had she conducted proper research, Lamb contends, she would have surfaced *United States v. Jones*, 565 U.S. 400 (2012), which held that the attachment of a GPS tracking device to a vehicle, and the subsequent use of that device to ascertain the vehicle's location on public roads, constituted a search under the Fourth Amendment. *Id.* (Lamb's petition acknowledges that *Jones* is cited in his brief to the Appellate Division, *see* Pet. at 16, but suggests — inaccurately, as discussed below — that pretrial and trial counsel failed to invoke the case. *See id.*) Lamb contends that counsel's error

prejudiced him because the prosecution "used the results of the illegal search to establish how Mr. Lamb was located." *Id.*[10]

Lamb did not raise this argument on direct appeal. But the State maintains that the "defendant exhausted this claim by filing a *pro se* motion to vacate his judgment in state court pursuant to N.Y.C.P.L. § 440.10 in which he asserted the same claim," Respondent's Supplement Brief at 3, ECF No. 16 at 3, and that motion was denied summarily by the trial court.  August 27, 2021 Order, ECF No. 16 at 22.  Because the State "explained in its brief" that Lamb "exhausted this particular ineffective assistance of counsel claim," it has "explicitly waived" the exhaustion argument, and the Court "may consider this claim on the merits." *Cornell v. Kirkpatrick*, 665 F.3d 369, 376 (2d Cir. 2011) (citing 28 U.S.C. § 2254(b)(3)).

As a threshold issue, the record belies Lamb's characterization of the underlying facts.  Notwithstanding his claim that counsel "failed to conduct any legal research," Pet. at 16, counsel submitted a memorandum of law with relevant case citations.  Most notably, and contrary to Lamb's suggestion that trial counsel missed the import of the Supreme Court's decision in *Jones*, the brief cites that case prominently.  *See* ECF 16 at

---

[10] Under *Kimmelman v. Morrison*, 477 U.S. 365, 371-73 (1986), the restrictions on federal habeas review of Fourth Amendment complaints under *Stone v. Powell* do not extend to claims of ineffective assistance of counsel based on deficient performance in a Fourth Amendment context at a suppression hearing.  Instead, the usual *Strickland* analysis applies.

14-15 (citing *Jones* and arguing that the "use of a cell phone as
a tracking device implicates these same concerns and also
constitutes a 'search'").  The memorandum went on to argue that
the prosecution had not satisfied Section 3125's requirement of
an "emergency situation," as the State "failed" to "establish
that exigent circumstances justified the police decision to not
wait until morning and get a warrant."  *Id.* at 15.[11]

Lamb argues that this was ineffective because
Callendar did not address the requirement that there "be
evidence of a threat of immediate danger or death or serious
bodily injury" to meet the statute's emergency element.  Pet. at
10.  And it is true that Callendar's memorandum did not address
Section 3125(a)'s requirement of an "emergency situation"
involving "immediate danger of death or serious bodily injury."
18 U.S.C. § 3125(a)(1)(A).[12]

But Lamb suffered no prejudice from this omission, He
because Justice Zayas considered that requirement anyway.  He
found that the N.Y.P.D. had "reasonably determined that an
emergency situation existed that involved immediate danger or
death or serious bodily injury."  H2 at 11:14-17.  He based that

---

[11] Callendar argued (among other things) that at the hearing, "Lee never
indicated that he received any further phone calls from defendant after the
shooting," and the "occupants of the house had apparently been removed from
any further danger."  *Id.* at 16.

[12] Section 3125(a) permits finding an "emergency situation" on three
other bases not relevant here in subsections (B), (C), and (D).

finding on hearing testimony concerning Lamb's "prior assault and the irrational threats made by" him to Lee, "as well as Detective Reed[']s own observation of the bullet holes in [Lee's] house." *Id.* at 11:9-13.

This ruling did not violate, or constitute an unreasonable application of, the rule announced in *Jones*. *Jones* did not consider an emergency situation. Eleven days into the long-term surveillance of an nightclub owner by the FBI, "agents installed a GPS tracking device" on his car "while it was parked in a public parking lot," and proceeded to track it over the course of "the next 28 days." *Jones*, 565 U.S. at 402. The FBI suspected Jones was trafficking narcotics. *Id.* Section 3125(a) was not at issue, and the Supreme Court did not consider the emergency exception to the Fourth Amendment at all, despite that exception's having long predated *Jones*. *See generally Kentucky v. King*, 563 U.S. 452, 460 (2011) ("One well-recognized exception [to the Fourth Amendment's warrant requirement] applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively unreasonable under the Fourth Amendment.") (citing *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The *Jones* Court's holding turned explicitly on the fact that "[t]he Government physically occupied private property for the purpose of obtaining information" by planting a physical GPS device on

Jones's car.  *Jones* at 404-5.  Such a "physical intrusion" constitutes a Fourth Amendment search, and thus generally requires a warrant.  *Id.*  Given these distinctions, Lamb cannot meet AEDPA's exacting standard.

> 2.   Trial Counsel's Use of the Sean Lee Recording

Lamb next argues that his lead trial counsel, Ernest Dubois, made four constitutionally relevant errors.  Two of these errors relate to the recording of a call between Sean Lee, who Lamb describes as "the State's chief witness," Pet. at 18, and Danielle Forrester, the mother of one of Lamb's children.

Lamb says that Forrester recorded this call, and that the recording "allegedly" — Lamb's word — captured Lee admitting that he did not see the shooter outside his home.  *Id.; see also* Tr. 659:7-9 (according to Dubois, the tape captured Lee admitting that "I didn't see it[,] it was the people upstairs who saw the vehicle alone").  The State moved to suppress the tape on the grounds that "[i]t's very difficult to hear what Sean Lee is saying."  Tr. at 654:22-23.  Justice Margulis listened to the tape *in camera* and concurred that "Sean [Lee] cannot be heard on this tape" — that it captured only Forrester's side of the conversation — and therefore granted the suppression motion.  *Id.* at 657:11-20.  Under New York law, "[a]n audiotape recording should be excluded from evidence if it is so inaudible and indistinct that a jury must speculate as to

its contents." *People v. Bailey*, 12 A.D.3d 377, 377 (2d Dep't 2004).  On that basis, Justice Margulis excluded the audio.

Lamb argues that his lawyer should have had the audio recording "enhanced" or, barring that, should have cross-examined Lee about the contents of this conversation. Pet. at 9 (arguing that counsel should have asked Lee to "translate what he said and what was said to him during that recorded phone call").

*Enhancement of the Recording.*  In his *pro se* supplemental brief to the Appellate Division, Lamb contended that Dubois was ineffective because he "didn't enhance the tape."  Lamb's *Pro Se* Second Dep't Brief at 31.  The Appellate Division rejected that argument on the merits, holding that "the defendant was not denied the effective assistance of counsel, as defense counsel provided meaningful representation." *Lamb*, 164 A.D.3d at 1472.  Lamb therefore adequately exhausted this claim.

Lamb has not established that the Appellate Division's conclusion was contrary to, or an unreasonable application of, *Strickland* or any later Supreme Court decision.  In the Appellate Division (as here), Lamb did not explain what particular enhancement process he had in mind.  Nor did he (or does he) indicate precisely what the enhanced audio would have revealed.  That "absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of

27

reasonable professional assistance." *Dunn v. Reeves*, 594 U.S. 731, 733-34 (2021).

In *Harrington v. Richter*, the Supreme Court reversed a circuit court's grant of habeas relief.  562 U.S. 86 (2011). The petitioner contended that his trial counsel was constitutionally ineffective for failing to consult an expert (in that case, a "forensic blood expert").  *Id.* at 106.  The Court observed that "[i]n many instances cross-examination will be sufficient to expose" the issues that a retained expert would speak to.  *Id.* at 111.

Relying on *Harrington* and the Court's subsequent decision in *Dunn*, the Second Circuit recently summarized the applicable standard as follows: a habeas petitioner "claiming that counsel was constitutionally ineffective in failing to consult with or call an expert witness must show that 'every fair-minded jurist would agree that every reasonable lawyer would have' consulted or called [the given expert] witness in the particular case." *Englert v. Lowerre*, --- F.4th ----, 2024 WL 3818574, at *10 (2d Cir. August 15, 2024) (quoting *Dunn*, 594 U.S. at 740).

Lamb has not cleared this high hurdle.  There are innumerable reasons why trial counsel would devote his efforts (and budget) to other endeavors besides the enhancement of the audio at issue.  As the Sixth Circuit once noted (also on habeas

review), it is possible that "trial counsel's decision not to
enhance the tape was strategic: [that] trial counsel believed
that a more accurate transcript might have further incriminated
the petitioner." *Covington v. Mills*, 253 F. App'x 495, 501 (6th
Cir. 2007). Here, given that Forrester made the recording
(presumably surreptitiously), the jury could have concluded that
Lamb induced her to attempt to extract a (false) statement by
Lee that he had not actually seen Lamb commit the shooting. In
the end, we simply do not know.

   *Cross-Examination of Lee*. Lamb did not argue the
point about Lee's cross-examination to the Appellate Division.
Even assuming Lamb's arguments about Lee's cross-examination
were properly exhausted, however, Lamb has not demonstrated
ineffective assistance.[13] Given Lee's direct testimony, Dubois
could very well have believed — reasonably — that Lee would not
have described the inaudible conversation on cross the way Lamb
does now. Dubois did cross-examine Lee about his *ability* to see
Lamb clearly, but Lee did not yield. Dubois asked: "So you saw
the car and it's 10 o'clock at night and its dark and you can

---

[13] *See Lambrix v. Singletary*, 520 U.S. 518, 523 (1997) (stating that
bypassing procedural questions to reach the merits of a habeas petition is
justified "if the [underlying issues] are easily resolvable against the
habeas petitioner, whereas the procedural-bar issue involved complicated
issues of state law"); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a
writ of habeas corpus may be denied on the merits, notwithstanding the
failure of the applicant to exhaust the remedies available in the courts of
the State.").

see exactly everything that's going on?"  Lee at 613:24-25.  Lee

responded, "Yes, sir."  *Id.* at 614:1.

Counsel is afforded broad deference in making such

strategic choices, because "advocacy is an art and not a

science."  *Strickland*, 466 U.S. at 681.  Indeed, the Second

Circuit has counseled that decisions about "whether to engage in

cross-examination, and if so to what extent and in what manner,

are . . . strategic in nature and generally will not support an

ineffective assistance claim."  *Dunham v. Travis*, 313 F.3d 724,

732 (2d Cir. 2002).  Given the finding that Lee's voice was

inaudible on the recording, it was eminently reasonable not to

belabor the issue by asking Lee to explain the conversation at

issue or "translate" the recording.

Moreover, Lamb has not demonstrated prejudice from

counsel's actions.  Lamb elicited other evidence aimed at

showing that Lee did not see him through the door through other

means.  Devante Lewis, one of Forrester's children, was with Lee

in the house during the shooting and testified at trial.  Lewis

at 764:3-25.  He testified that during the shooting he saw that

Lee "was going to go to the door but he didn't," and therefore

would not have been able to identify Lamb as the shooter.  *Id.*

at 766:18-25.  Lamb therefore cannot show that "but for

counsel's unprofessional errors, the result of the proceeding

would have been different."  *Strickland*, 466 U.S. at 694.

3.  <u>Inconsistency or Repugnancy of Charges</u>

Lamb's next ineffective-assistance argument is that
Dubois was ineffective because he failed to object to "the
repugnant charges of attempted murder and reckless
endangerment," and "failed to move for dismissal of the
indictment due to repugnancy" — that is, inconsistency — of the
charges.  Pet. at 9.[14]  Lamb raised a version of these arguments
in his *pro se* supplemental brief to the Appellate Division.
There, he argued that "counsel was not prepared and failed to
conduct any legal research, as evidence at trial of the charges
of Attempted Murder and Reckless Endangerment in the first
degree were inconsistent with each other," and that "[c]ounsel
neglected to move for dismissal of the indictment."  Lamb's *Pro
Se* Second Dep't Brief at 7-8.  The Appellate Division rejected
these arguments on the merits, holding that Lamb was afforded
meaningful representation.  *Lamb*, 164 A.D.3d at 1472.

That decision was not contrary to, or an unreasonable
application of, *Strickland*.  If counsel had moved to dismiss the
indictment on the ground that the attempted murder and reckless
endangerment charges were "repugnant" (or inconsistent) with

---

[14] Lamb raises this argument twice in his petition under separate
headers.  *Compare* Pet. at 17 (arguing that "Counsel failed to object on
several meritorious issues . . . to wit, the repugnant charges of attempted
murder and reckless endangerment) *with id*. at 23 (arguing that "Counsel
failed to move for dismissal of the indictment due to the repugnancy of the
charges").

each other, that motion would have been denied.  "[R]eckless endangerment [is] properly chargeable as a lesser included offense of attempted murder."  *People v. Teasley*, 73 A.D.2d 548, 548 (1st Dep't 1979).  As to the eventual verdict, as the New York Court of Appeals has explained, under New York law a "verdict is inconsistent or repugnant — the difference is inconsequential — where the defendant is convicted of an offense containing an essential element that the jury has found the defendant did not commit."  *People v. Trappier*, 87 N.Y.2d 55, 58 (1995).  That is to say that a verdict is repugnant if "the jury reached an inherently self-contradictory verdict."  *Id.*

But even if the jury convicted Lamb on both charges based on the same conduct — shooting at Lee — that would not be inherently self-contradictory under New York law.  The Appellate Division has held that "a jury could reasonably conclude that when the defendant fired his handgun at [one person] with the intent to kill him he also recklessly engaged in conduct that created a grave risk of death to [a different person]."  *People v. Campbell*, 208 A.D.2d 641, 642-43 (2d Dep't 1994).  As a result, that defendant's attempted murder conviction was "not inconsistent with his reckless endangerment conviction because guilt of one does not *necessarily* negate guilt of the other."  *Id.* at 643 (emphasis added).

Regardless, this claim fails under the concurrent sentence doctrine because all of Lamb's counts run concurrently. That doctrine "allows courts, in their discretion, to avoid reaching the merits of a claim altogether in the presence of identical concurrent sentences since a ruling in the defendant's favor would not reduce the time he is required to serve or otherwise prejudice him in any way." *Kassir v. United States*, 3 F.4th 556, 561 (2021); *see Terry v. Collado*, 2023 WL 5350829, at *3 (E.D.N.Y. Aug. 21, 2023) (collecting cases). Justice Zayas imposed a twenty-five year sentence for attempted murder and a maximum sentence of seven years for reckless endangerment. Sentencing Tr. at 19:4-10, ECF No. 8-4. He ran both sentences "concurrently with each other." *Id.* at 20:9-13. Even if this Court were to grant Lamb the relief he seeks and lift the reckless endangerment sentence, it would not reduce his overall time in prison. *See Kassir*, 3 F.4th at 564 (declining to reach the merits of a habeas petition because "[n]o matter the success of [the petitioner's] argument, we cannot shorten the time he will remain in prison").

Because neither the charges nor the eventual verdict were inconsistent or repugnant, and because even if they were Lamb has suffered no prejudice given his concurrent sentences, trial counsel's failure to object on that basis does not constitute a ground for habeas relief.

4.   <u>Motion to Dismiss the Attempted Murder Count</u>

Lamb also argues that his trial counsel was ineffective because he "failed to move for dismissal of attempted murder on [the] ground of insufficient evidence." Pet. at 9.  Lamb raised this argument before the Appellate Division, which rejected it.  *Lamb*, 164 A.D.3d at 1472.

Under New York law, in order to preserve a sufficiency claim, a defendant must do more than make a blanket objection (akin to a Rule 29 motion in federal court).  Instead, he must make arguments "specifically directed" at the alleged deficiencies in the State's proof.  *People v. Gray*, 86 N.Y.2d 10, 19 (1995).

Lamb is correct that his trial counsel did not make a specific argument regarding why the State's evidence had failed to establish a *prima facie* attempted-murder case.  Rather than pointing to specific flaws in the State's case, Dubois argued only that "[w]e don't believe there is enough going forward to allow the jury to properly deliberate."  Tr. 795:21-796:1. Justice Margulis denied the motion, noting that "[t]his is strictly [a] credibility question that the jury will decide." *Id.* 796:7-8.  However, even properly made, such a motion would not have succeeded, given the extensive evidence of Lamb's guilt.  And counsel is not ineffective for failing to raise a meritless argument.  *Aparicia v. Artuz*, 269 F.3d 78, 88 (2d Cir.

2001) (concluding, on habeas review, that failure to raise a
"meritless" claim did not constitute ineffective assistance of
counsel under *Strickland*).

Courts have held as much in connection with the
failure to make fully developed insufficiency-of-the-evidence
motions for acquittal: counsel is not ineffective when "such a
motion would have been futile" in light of the substantial
evidence of guilt presented. *Rodriguez v. United States*, No.
11-CV-6707, 2013 WL 3388223, at *10 (S.D.N.Y. July 8, 2013);
*accord Finley v. Graham*, No. 12-CV-9055, 2014 WL 10965412, at
*20 (S.D.N.Y. Aug. 26, 2014) (counsel not ineffective where "the
evidence was legally sufficient to convict").

Lamb contends the evidence was insufficient to sustain
the attempted-murder conviction because the State presented no
evidence that he "had reason to believe that there were people
in the house, much less than Sean Lee was in the home at that
time." Pet. at 34. But that is not a fair reading of the trial
record. In fact, Lamb knew Lee was home because he had spoken
to Lee that night by phone, and Lee said as much: that the
"police have been here" — i.e., at the scene of the earlier
assault on Forrester — "and we have the kids." Lee at
578:11-15. Lee also testified that he told Lamb to "come and
get your children," who (as Lamb knew) were at the house with
Lee. *Id.* at 578:5-9. Given this, Lamb's argument is

contradicted by the trial record, and his counsel was not ineffective for failing to press the insufficiency claim with more specificity.

**E.    Evidence of Uncharged Crimes**

Lamb next argues that the trial court erred by allowing the State to present evidence at trial of uncharged crimes committed by Lamb without giving proper notice to defense counsel in the form of a "*Ventimiglia* hearing." Pet. at 6. In New York state courts, "a *Ventimiglia* hearing is held to determine whether evidence of uncharged crimes is admissible as direct evidence." *Jones v. Artuz*, 96 F. App'x 742, 743 n.1 (2d Cir. 2004). It is a creature of state, not federal, law, and Lamb cites no federal case, statute, or constitutional provision in either his *pro se* Appellate Division brief or his petition here in support of this claim. To the contrary, he expressly argues that a *Ventimiglia* hearing is required "under New York Law." Pet. at 6.

Such a claim is beyond the scope of federal habeas review. *See* 28 U.S.C. § 2254(a) (writ available to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States"). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68.

F.   *Brady* Allegations

Lamb argues that the State violated his "*Rosario/Brady*" rights by failing to provide him with "911 Sprint material associated with the alleged crime/incident," although he does not specify the nature of that material.   Pet. 6-7.   Lamb did raise this argument in passing in his *pro se* supplemental brief to the Appellate Division, thereby exhausting it, Lamb's *Pro Se* Second Dep't Brief at 9, although the court did not address the argument in its opinion.   *See Dye v. Hofbaur*, 546 U.S. 1, 3 (2005) (claim is exhausted when raised in state appellate briefing, even if state court fails to address the claim squarely).   But in his Appellate Division brief, as in his petition before this Court, Lamb treats this argument as an afterthought — he addresses it (briefly) only at its highest level of abstraction — and he never explains, for example, what the "911 Sprint material" is.

Lamb has not identified a basis for relief.   The New York Court of Appeals held in *People v. Rosario* that the State is required to disclose any statement of a witness whom it intends to call at the hearing or trial.   9 N.Y.2d 286 (1961). But *Rosario* relied entirely on New York law, and thus presents no federal constitutional question.   *See Cruz v. Scully*, 716 F. Supp. 766, 769 n.5 (S.D.N.Y. 1989); *United States ex rel. Butler*

*v. Schubin*, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), *aff'd*, 508 F.2d 837 (2d Cir. 1975).

Lamb's claim under *Brady v. Maryland* also fails. *Brady* requires the State to turn over material, exculpatory evidence in its possession.  313 U.S. 83 (1963).  This duty is broad: it applies even absent a request by the defendant, *United States v. Agurs*, 427 U.S. 97, 107 (1976); encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985); and applies even to evidence in the possession of cooperating agencies — for example evidence in the possession of "police investigators and not the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "To make out a *Brady* violation, a petitioner much show that material exculpatory or impeachment evidence was suppressed by the state, either willfully or inadvertently." *Jimenez v. Stanford*, 96 F.4th 164, 199 (2d Cir. 2024).

But Lamb does not indicate why the "Sprint material" would have tended to exculpate him or allow impeachment of a witness, just that the prosecution's failure to disclose it "prevented the defendant's counsel [from] properly investigating these [unspecified] issues." Pet. at 6-7.  And furthermore, Lamb's counsel did question Detective Reed regarding "the Sprint Report" extensively at the pretrial suppression hearing,

indicating that it had in fact been disclosed to the defense.[15]
H1 at 50:5-25.  Having omitted to describe the exculpatory (or
impeachment) value of the material in any substantial way, Lamb
cannot establish prejudice — that is, a "reasonable probability
that his conviction or sentence would have been different had
these materials been disclosed." *Strickler v. Greene*, 527 U.S.
263, (1999).  This argument therefore fails.

## G.   Inconsistent Verdict

Finally, Lamb argues that his sentence was illegal
because it was the result of an inconsistent verdict.  Pet. at
7.  This, too, appears to be an argument under New York state
law, rather than federal law — Lamb nowhere argues that his
sentence was unconstitutional, or violated any specific federal
statute.  Regardless, the argument would be procedurally barred.
As discussed above, the Appellate Division held that Lamb's
contention "that the verdict finding him guilty of both
attempted murder in the second degree and reckless endangerment
in the first degree is repugnant" was "unpreserved for appellate
review," and denied the claim based on New York's

---

[15] Callender asked Detective Reed if the Sprint Report had "any
information about a license plate being an Alabama dealer plate," and he
replied that he did not remember, but that reviewing the Spring Report itself
would refresh his recollection.  H1 at 50:16-19.  Justice Zayas asked counsel
if "either of you have it."  *Id.* at 51:2-3.  The State prosecutor replied,
"I'm looking, Judge," and Callender replied "Hold on," while searching for a
copy.  *Id.* at 51:4-5.  Callender proceeded to ask Detective Reed specific
questions about the contents of the Sprint Report, such as how it described
the vehicle, and whether it listed Lamb as the shooter.  *Id.* at 51:22-52:12.

contemporaneous objection rule.  *Lamb*, 164 A.D.3d at 1472.
Again, that rule is sufficient to bar review in this court in
most circumstances, *see Downs*, 657 F.3d at 102-104; *see also
Coleman*, 501 U.S. at 729-30, and Lamb offers no argument that
cause existed for his procedural default, that he suffered from
actual prejudice, or that a miscarriage of justice would result
from this court denying review of the claim.

## V.   Conclusion

Lamb's petition is cogent and thoughtfully written.
Nonetheless, the Court must deny all of Lamb's claims as either
meritless or procedurally barred.  Accordingly, the petition is
dismissed in its entirety.  Because Lamb has not made a
"substantial showing of the denial of a constitutional right," a
certificate of appealability will not issue.  28 U.S.C. § 2253.
The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any
appeal would not be taken in good faith and *in forma pauperis*
status is therefore denied for purposes of an appeal.  *Coppedge
v. United States*, 369 U.S. 438, 444-45 (1962).  Lamb, however,
has a right to seek a further certificate of appealability from

the Court of Appeals for the Second Circuit.  *See* 28 U.S.C. §

2253(c)(1).


SO ORDERED.


_____/s/ Eric Komitee_____

ERIC KOMITEE
United States District Judge


Dated:    September 13, 2024
          Brooklyn, New York